In re Francisco Navarro Ortiz, Judge of the District Court of Mayagüez, Respondent.

No. 1. Argued May 22, 1942.—Decided June 3, 1942.

Original action in the Supreme Court. Impeachment proceedings instituted by George A. Malcolm, Attorney General of Puerto Rico, against Francisco Navarro Ortiz, District Judge of Mayagüez. *Respondent's removal from office recommended to the Governor of Puerto Rico.*

*George A. Malcolm, Attorney General, Ricardo A. Gómez, Prosecuting Attorney, J. Suárez Garriga, Prosecuting Attorney at Large,* and *José C. Aponte, Assistant District Attorney of San Juan* for complainant. *F. Navarro Mendín, José Sabater, Oscar Souffront, Miguel A. García Méndez, Gilberto López de Victoria,* and *Celestino Iriarte* for respondent.

Mr. Chief Justice Del Toro delivered the opinion of the court.

On April 29, 1930, the Governor of Puerto Rico approved Act No. 58, passed by the Insular Legislature, prescribing that the offices of judges of the district courts of this island shall be held by judges appointed for a term of ten years, and providing for their appointment and removal.

Pursuant to the provisions of the second paragraph of §3 of that act, George A. Malcolm, Attorney General of Puerto Rico, on April 13, 1943, filed in the office of the secretary of this court a written complaint, signed and sworn to by him as complainant, preferring six charges against Francisco Navarro Ortiz, Judge of the District Court of Mayagüez, and praying that the court order its prosecuting attorney to make a preliminary investigation of the same and to report to the court the result thereof.

This court examined the complaint and ordered the making of the preliminary investigation according to law.

On April 28, 1942, the complainant Attorney General filed another written statement, signed and sworn to by him, supplementing the first and second charges of his complaint, and the court ordered that the preliminary investigation be extended to cover such addition.

On the 4th of the following May, the prosecuting attorney reported that he had made the preliminary investigation ordered, and that, in his judgment, it appeared from the same that the charges preferred had been substantiated. On May 5, 1942, the court, deeming that there were sufficient merits therefor, ordered that Judge Navarro Ortiz be served with notice of the complaint, of the supplemental charges, and of the report of the prosecuting attorney, notifying him that it would meet on May 22, at nine o'clock in the morning, and on the succeeding available days, in order to hold the proper hearing.

After the respondent had been served with said notice, he filed his answer and defense on May 20, 1942, and on May 21 the prosecuting attorney moved to strike therefrom certain paragraphs of subdivision (c), fourth charge, and its "special defenses."

On the day set, with the attendance of the complainant, the respondent, his counsel, and the prosecuting attorney of this court, the hearing was commenced. The parties were heard on the motion to strike filed by the Prosecuting Attorney, and the court ordered the striking out of the third paragraph of subdivision (c), fourth charge, as being immaterial, and the "special defenses" as being irrelevant. The hearing proceeded, and lasted during Saturday the 23rd, Monday the 25th, and Tuesday the 26th of May, 1942, terminating on the 26th with oral arguments made on behalf of the complainant by the Prosecuting Attorney of this court, Mr. Gómez, by the Attorney General, Mr. Malcolm, by the

District Attorney, Mr. Aponte, and on behalf of the respondent, by his attorneys, Mr. M. A. García Méndez and Mr. José Sabater. Both parties were present at all the sittings held, and they were granted until May 28 to submit memoranda of authorities, which they did accordingly.

The act prescribes that if, after due consideration of the evidence introduced, the Supreme Court finds that the complaint, or any substantial part thereof, is true, it shall adopt a resolution recommending to the Governor the removal of the defendant judge, and with a view to complying with that duty, we now proceed to examine the evidence regarding the charges in the same order in which the latter were preferred.

1. Let us see the first one. It relates to the conduct of the respondent in two prosecutions for adulteration of milk, in which former convictions (*reincidencia*) of the defendants were alleged. The complainant states that the interest shown by the respondent in having the former conviction established in the first of these cases—*People* v. *Acosta Padilla,* in which the defendant was represented by Attorney P. N. Colberg—was unusual, while in the second case—*People* v. *Toro Zapata,* in which the defendant was represented by Attorney C. García Méndez—he consented to the striking out of the allegation of the former conviction; and complainant maintains that the conduct of the respondent shows inexcusable negligence in the performance of his functions as a judge, immoral conduct in favoring some lawyers as against others, and manifest incompetence in the discharge of the duties of his office.

The case of *People* v. *Acosta* came before this court on appeal. The action of the judge in directing that the former conviction be proved "in spite of the fact that the district attorney did not try to show it," was assigned as error. This court overruled the assignment. It made an extensive recital of what occurred, according to the record, and it finally said:

"... In the information a former conviction was alleged, stating the number of the case in which the defendant had been convicted. When the district attorney tried to bring the fact of the former conviction by oral testimony, the defendant objected and alleged hat the best evidence was the judgment book. It was then that the court directed the book to be brought before it, and it does not appear from the record that the defendant objected or took exception." *People* v. *Acosta*, 56 P.R.R. 132.

The conduct of the respondent in said case seemingly was that of a judge who was anxious to have all of the evidence introduced in a proper way, his zeal carrying him to the point of aiding counsel for the prosecution in his task. The judgment sentencing the defendant to six months in jail and to pay a fine of $500 and ordering the cancellation of his license for selling milk, was rendered on February 11, 1939.

In the other case, that is, in *People* v. *Toro Zapata,* also for adulteration of milk, a former conviction was alleged in the information in the following terms:

"A former conviction of this defendant is alleged as follows: The said defendant, José Toro Zapata, was prosecuted in case No. 9047 of this District Court of Mayagüez, P. R., and sentenced on March 1, 1935, to pay a fine of $25 and to be confined in jail one day for each dollar thereof left unpaid, for the offense of transporting adulterated cow's milk for human consumption, which sentence became final (*firme*) and has been served by the defendant, no appeal having been taken therefrom."

The holding of the trial was postponed several times. Finally, the record shows that on March 2, 1939, that is, about twenty days after the rendition of the judgment in the *Acosta* case, the following occurred:

"The People of P. R. by its Special Prosecuting Attorney, Hon. V. Palés Matos, and the defendant personally and represented by Attorney C. García Méndez, the latter in substitution of P. N. Colberg, who is the attorney of record of the defendant, appear for the trial of this case.

"The Prosecuting Attorney requests leave of the court to strike from the information the allegation of a former conviction, and the court orders that the matter be eliminated as requested.

"The defendant, through his counsel, pleads guilty to the crime charged against him.

"The court finds the defendant José Toro Zapata guilty and convicts him of the offense of having and keeping in his possession, transporting, carrying, and offering for sale, to be used for human consumption, adulterated cow's milk, and renders judgment sentencing him to pay a fine of $25 and in default thereof to be confined in jail one day for each dollar left unpaid, with credit for any time he may have spent in custody for this same cause, and to the payment of costs."

It is true that within our prosecuting system, it is the district attorney who has the control of his cases; but here the information had already been brought containing the allegation of a former conviction, and the district attorney, in order to strike out the same, requested leave of court therefor, and the court, which had so zealously acted in a similar case a few days before, forthwith decreed the elimination requested without the record showing that it even inquired as to the reasons for the request of the district attorney, and it unavoidably strikes one's attention that this should happen after the attorney for Toro Zapata, who was the same one that had represented Acosta Padilla, had been replaced.

The respondent has sought to explain the striking out of the allegation of a former conviction in the sense that this was done because it was the proper thing to do in accordance with the law, since in the present information Toro Zapata was charged with "having and keeping in his possession, transporting, carrying, and offering for sale, to be used for human consumption, adulterated cow's milk," whereas in the former information, under which he was convicted, he was only charged with "transporting, to be used for human consumption, adulterated cow's milk."

The explanation is not an acceptable one. The former information charged the commission of the offense for which the defendant was convicted, adulteration of milk, in one of the modalities thereof, transporting adulterated milk for

human consumption, and the present information charged against the same accused the same crime in the same modality thereof and in others. The allegation of a former conviction was, therefore, properly set forth in accordance with the law and the cases. Act No. 77 providing punishment for the adulteration of milk and for other purposes, approved August 12, 1925 (Laws of 1925, p. 559); *Martínez* v. *People of Puerto Rico,* 46 F. (2d) 427, and *People* v. *Cotis,* 50 P.R.R. 464, wherein it was held that "the carrying of adulterated milk for human consumption constitutes a crime in conformity with the law, even though the person who transports the milk is not the one who adulterated it."

Supplementing the first charge, four additional ones were submitted relating (*a*) to the approval of a certain deed of adoption; (*b*) to a declaration of heirship; (*c*) to the proceedings concerning the intestate estate of Inés Rivera Irizarri; and (*d*) to certain renewals of licenses for carrying weapons.

(*a*) The complainant maintains t h a t the respondent showed manifest incompetence and negligence as a judge in approving the deed of adoption in civil case No. 2967, Dr. Nelson Perea Fernández, as he did so without receiving documentary evidence as to the age of the adopting parents, without any written report from the district attorney, and without the stenographic transcript of the hearing being attached to the record.

The respondent answered that no documentary evidence as to the age of the wife of the adopting parent was necessary; that he had before him authentic proof of the age of the adopting parent, Dr. Perea; that no written report from the district attorney was necessary; and that the approval was made in accordance with the law.

The record introduced in evidence by the complainant is composed of the initial petition presented through Attorney C. García Méndez on November 25, 1940; of a certificate attesting to the birth of Francisco José Orta on June 7, 1940,

son of Flor de Luz Orta, seventeen years of age, born in Mayagüez; of the order of approval, the second recital ("whereas") of which reads thus: "Whereas, upon examining the documentary evidence introduced, which consists of a certified copy of said deed and of a literal certificate of the birth of said adopted minor, and upon considering likewise the oral evidence introduced at the hearing of this case, it appears that all the legal formalities required therein have been complied with"; of a copy of a minute stating that documentary and oral evidence was introduced on November 27, 1940; and of a petition requesting the withdrawal from the record and the delivery of a deed of adoption in order to record the same in the Registry of Vital Statistics, which was granted accordingly.

The respondent introduced in evidence a copy of the deed of adoption and a copy of the record issued on May 8, 1942. In the record there appear the statements of Dr. Perea, of Flor de Luz Orta, and of Gil Orta; and it also appears from the same that counsel for the petitioner referred to the deed of adoption and to the birth certificate attached to the record, and that the Judge said:

"They are admitted in evidence. Let the stenographic transcript of the testimony taken be attached to the record and let the same be referred to the district attorney for his report, after which an order will be drawn declaring this child an adopted son of Dr. Nelson Perea and Joaquina Ferrer Vera, in order that said child may hereafter enjoy all the legal rights prescribed by the Civil Code."

It then appears proved that the stenographic transcript was never attached to the record, that the best evidence regarding the age of the adopting parent was not introduced, and that the district attorney was not heard, as the court itself had ordered.

(b) The complainant alleges that the respondent showed incompetence as a judge in conducting the proceedings for the determination of the heirs of Juana Fantauzzi, Civil Case No. 1969, of the District Court of Mayagüez. From

the record introduced in evidence by the complainant, it appeared that the initial petition was presented through Attorney A. Ramírez Silva, on July 24, 1939, praying for a declaration of heirship in favor of two brothers; that on the 4th of the following August, proofs were taken before a special judge, Mr. Sabater, who called the attention of counsel to the publication of edicts; that on August 21, 1939, there was attached to the record an affidavit of the petitioner asserting that the value of the estate did not exceed one thousand dollars; and that on December 21 of the same year, there was rendered a final order declaring Cipriano Fantauzzi and the petitioner heirs of their sister Juana Fantauzzi. Said order appears signed by the respondent in his capacity as district judge.

The respondent in his answer alleged that the proceedings had been conducted in accordance with the law, and in his testimony at the hearing he explained that the case had been submitted to him in his chambers by counsel for the petitioner when the special judge had ceased to act and respondent had resumed his duties; and that he did not order the publication of edicts, as there was involved an estate whose value did not exceed one thousand dollars. Counsel for the petitioner testified and corroborated the statements of the judge.

The irregularity which is observed is that the matter should have been submitted to the respondent judge in writing and not verbally. As to the edicts, it was discretionary with the judge to order the publication thereof.

(c) The complainant charges the respondent with incompetence, negligence, and favoritism in making the declaration of heirship in favor of certain persons without having before him their birth certificates, which were attached to the record after the order had been rendered .

From the original record of civil case No. 1268, concerning intestate estate of Inés Rivera Irizarri, it appears that the case was instituted by Francisco Rivera Irizarri through

his Attorney C. García Méndez, on July 13, 1938, praying that there should be declared as heirs of Doña Inés Rivera, who died in Ponce, and whose property was located in San Germán, her minor children, Amelia, Gladys, and Héctor, and her surviving husband; and that on July 22, documentary and oral evidence was heard. At the close of the proceedings counsel for the petitioner said:

"We are going to ask that the case be left open for further proof regarding the birth certificates of two of the children, as it turns out that they were born in. the United States and we do not have them."

And the respondent judge ruled thus:

"The documentary evidence offered is admitted and marked 'Petitioner's Exhibits "A" and "B"', and the case remains open for introduction of the documentary evidence that is lacking, after which, let the stenographic transcript of the testimony taken be attached to the record and a draft for an order be prepared, and the court will decide."

At this stage, in the same month of July, without the missing documentary evidence having been presented, the same not having been procured in New York until the 8th of the following August, the respondent judge decreed the declaration of heirship sought. The second recital ("Whereas") of his order, textually copied, reads as follows:

"Whereas, there were attached to said petition the corresponding documents, and a day having been set for a hearing of the said petition in open court, the oral evidence offered consisting of the testimonies of two witnesses was introduced, and all the averments of the petition were proved, and said hearing having been attended by the district attorney who stated that he had no objection to offer to the petition, without there being any opposition from any other party either, and all the legal requirements having been complied with in this proceeding."

The answer of the respondent to this addition to the first charge was to the effect that prior to the rendition of his

order of July 29, 1938, he had before him the birth certificates of the heirs Gladys and Amelia Rivera, but as he found the same to be defective, he suggested to counsel for the petitioner that amended certificates be procured; and that the certificates were not necessary, as he could in his discretion base his declaration of heirship on the oral evidence introduced. At the hearing, the judge testified in the same sense as stated in his answer. To a question put to him by Mr. Justice de Jesús, as to whether the imperfect certificates had been attached to the record, he answered: "The attorney took them in order to send them to New York."

There remains uncontroverted the fact that the matter was decided without the judge having before him the best evidence, for the introduction of which the case had been expressly left open. Moreover, we have seen that in the above-transcribed recital of the order it is said: "and said hearing having been attended by the district attorney who stated that he had no objection to offer to the petition." Yet, neither from the stenographic transcript nor from any other portion of the record do the statements of the district attorney appear, nor does it appear that he was even present at the hearing.

(d) This last addition to the first charge comprises the acts of the respondent judge in three proceedings for the renewal of licenses for carrying weapons which, as maintained by the complainant, reveal favoritism towards the law office of Attorney M. A. García Méndez. It is charged that on February 13, 1939, in civil case No. 17473, Dr. Enrique Lassise, renewal of license for carrying weapons, a renewal was requested; that on March 10, 1939, a hearing was held and on March 22, 1939, the respondent judge granted the license without any report from the district attorney, notwithstanding the same had been ordered by the judge himself, and that the same thing happened in civil case No. 17781, José Ramón Flores, and in civil case No. 17452, Del-

fín Rodríguez Carlo, in all of which the petitioners were represented by the law office of García Méndez.

In order to prove that charge the complainant produced the three records. They originated in 1934. In 1939, the petitioners appeared through the above-stated counsel and requested that the licenses be renewed. The respondent judge ordered that proofs be taken and the same having been taken, he directed that the stenographic transcript be attached to the record in each case and that the latter be referred to the prosecuting attorney for his consideration and report; and in all of the cases he rendered final decision stating thus: "and in view of the consent of the district attorney." The stenographic transcripts of the evidence and the edicts are attached to the records, but the reports of the district attorney are lacking therefrom.

The respondent in his answer denied having made the orders in question without the reports of the district attorney, and alleged that if said reports do not appear in the records "they must have been maliciously detached from the records of said cases." At the hearing, the respondent testified that in no case of renewal heard by him as a judge had he acted without the prior publication of edicts, without a report of the district attorney, or without evidence "because it might be that the conduct of the petitioner had changed," and that notwithstanding the fact that this Supreme Court has held that when the district attorney attends a sitting of the court his written report is not necessary, he has always required it to be incorporated in the record.

There remained uncontroverted the fact that the reports of the district attorney do not appear in the records which, with their pages numbered, were delivered by the clerk of this court to the investigating attorneys and which in the same form were introduced in evidence. Perhaps they may have become lost in the office of the clerk, but it is noteworthy that the same thing should have happened in the three cases.

2. We will now proceed to consider the second charge. In it the complainant maintains that the respondent judge showed manifest incompetence and inexcusable negligence in deciding the *habeas corpus* proceeding, civil case No. 3065, Julio López v. Camelia Rodríguez, upon evidence which was never introduced in the same, and that he was guilty of immoral conduct and of a penal offense in altering in his own handwriting the record, particularly the transcript of the minute of January 27, 1941, in order maliciously to conform the same to the judgment rendered on March 13, 1941.

In the answer it is maintained, in brief, that the *habeas corpus* case was submitted to the respondent judge for his decision on January 24, 1941; that evidence having been introduced in a hearing on an incidental motion within the suit for divorce which was pending between the same parties in the *habeas corpus* case, he involuntarily acted on the erroneous impression that such evidence had been introduced in the latter case and he referred to the same in his opinion, amending the transcript of the minute attached to the record, as he thought that it was his duty to do so; that he could well have reached the same conclusion that he reached in his judgment denying the petition for *habeas corpus* without referring to any evidence, as when that case was submitted to him on January 27, four days had already elapsed since the suit for divorce was commenced, and Section 98 of the Civil Code provides that children born out of the marriage shall be placed under the custody of the wife during the time the suit is pending, unless there be strong reasons to the contrary; and that his good faith is shown by the fact that he set aside his judgment, and that when the case was again submitted to the District Judge at Large, Mr. Massari, it was again decided by dismissal of the complaint.

The existence of the *habeas corpus* and divorce cases has been admitted. Also that the hearing of the *habeas corpus*

proceeding, set for January 24, 1941, was postponed to the 27th, at which time the suit for divorce had already been brought.

The evidence is not uncontradicted on the question of whether or not the *habeas corpus* case was submitted for decision of the court on January 27, 1941. The minute, as originally drawn, states that it was thus submitted, and Pascual Frank Paganacci, clerk of the court, so asserted. Enrique Báez García, attorney for the plaintiff, on the contrary, stated in his testimony that the *habeas corpus* case remained pending and that the only matter argued was the effect upon it of the filing of the suit for divorce. The notes of what occurred in open court, which were taken by Rosa María Sánchez, who on that day had acted as court reporter, corroborate the testimony of Attorney Charneco, counsel for the defendant in the *habeas corpus* proceeding, plaintiff in the divorce suit. We are inclined to resolve the conflict in the sense that the *habeas corpus* case had not been submitted to the judge for final decision.

It has also been admitted that the *habeas corpus* case was decided by a judgment of March 13, 1941, based on an opinion wherein reference is made to some evidence heard which was never introduced, and that the minute of the proceedings had on January 27, 1941, was altered by the judge who added thereto, in his own handwriting, the words "and both parties having introduced their evidence"; but in regard to the latter fact the evidence is conflicting as to the date on which the alteration was made, for both the judge and the clerk stated that it was made on the same day, March 13, on which the judgment was rendered, whereas Báez García emphatically asserted that it was made after he had talked to the judge and had gone to look for the attorney for the opposite party. Shortly before that he had seen the minute without the alteration, and on his return he found it made, with the ink still fresh.

It has likewise been admitted that within the divorce suit, on the petition regarding temporary alimony, after January 27 but before March 13, 1941, evidence was introduced, and that according to the minute of March 21, 1941, a copy of which is found in the record of the *habeas corpus* case, the court set aside the judgment of the 13th ''because an involuntary error had been made.''

This charge is indeed serious. Even though it be conceded that the judge did not act with a wrongful intention, it must be concluded that he was extremely negligent in the examination of the record, or that his mind was not functioning properly in deciding the *habeas corpus* case by delivering an opinion, in which not only is it stated that evidence was taken but also reference is made to the same, when the truth is that such evidence had never been introduced. The fact of having heard evidence in the proceedings for alimony tends to explain the occurrence, but such an explanation cannot be accepted as satisfactory.

And that is not all. What completes the charge and renders it more grave, is the behavior of the judge upon his attention being called to the occurrence by the attorney for one of the parties, when he ratified his actions and in order to justify the same, while said attorney went to look for the counsel for the opposite party, he personally altered the minute by making appear as true something whose falsity could no longer be unknown to him. That behavior when confronted with his error constitutes immoral conduct which is incompatible with the behavior that should be observed by a man to whom is entrusted the task of administering justice.

To this second charge the complainant added two others which he marked with the letters (*a*) and (*b*).

(*a*) This additional charge consisted in the respondent judge having sentenced Juan Torres Valentín for the offense of carrying a weapon without there being any information brought against him for that offense.

The complainant alleges that this shows incompetence and negligence on the part of the respondent in the performance of his official functions and little zeal for the civil rights and the liberty of the citizen. He supported the charge by means of documentary evidence.

The respondent in his answer admitted the occurrence of the facts but denied that they showed any incompetence, negligence, or lack of zeal, and explained that they were due to what ordinarily happens in cases of murder and of carrying weapons, to the enormous amount of work, and to the necessity of handling numerous criminal and civil matters, especially during the morning sessions. He called as a witness one of the attorneys who had acted in the proceedings, Pascasio Fajardo Martínez, who testified thus:

"Q. My colleague, do you remember having acted as counsel jointly with Attorney Pedro Baigés Gómez, in the murder case against Juan Torres Valentín, a case which was tried before the District Court of Mayagüez, presided over by Hon. Judge Francisco Navarro Ortiz, on or about January 31, 1939?

"A. I was one of the attorneys.

"Q. My colleague, do you remember whether after a verdict for manslaughter was returned in said case, any act was done by you and our colleague Baigés Gómez and the acting district attorney, if any such act was done that day?

"A. I will explain. The trial began. The evidence for the prosecution was heard. The evidence for the prosecution was not as strong as the district attorney thought that it would be, and then we compromised with him in the sense that he would consent to our entering a plea of guilty of voluntary manslaughter; and we did so. Then the Hon. Judge set a day for pronouncing sentence and on that occasion the public prosecutor, that is, the district attorney, said: 'Well, there remains pending a misdemeanor.' Then, without realizing it, perhaps influenced by the fact that there was a bail bond for a misdemeanor in the record, or perhaps because from our experience we know that in all these cases accusations are brought for the misdemeanor and for the felony, we said: 'There is no objection. We enter a plea of guilty also, and ask that the pronounce-

ment of the sentence be postponed to the same day as in the felony case.' The court so ordered.

" *  *  *  *  *  *  *

"Q. After that, what, if anything, happened?

"A. Well, one or two days before the time for pronouncing sentence, when we examined the case, we saw that there was no accusation for the misdemeanor. We went to the district attorney and told him: 'Well, where is the complaint for the misdemeanor?' He said: Gosh, it is not there.' Thereupon he drafted it and filed it and then, as we had entered a plea of guilty on behalf of the defendant for a misdemeanor,we went to the judge and explained— I do not remember whether in writing or orally—the situation; we advised him of our responsibility and we asked to be relieved from the plea of guilty; and he did so, and then we filed a motion to dismiss the prosecution on the ground that the same was barred, as more than one year had elapsed.

"Q. Did the judge make any correction when you advised him of what had happened and asked for a reconsideration?

"A. He decided both questions in our favor, that is, he relieved us from the plea of guilty and then set aside the filing of the complaint by the district attorney and ordered the dismissal of the case.

"Q. Did your client suffer any prejudice or receive any sentence in addition to the one imposed upon him for his conviction of manslaughter?

"A. No, sir."

No prejudice was caused to the defendant, but the occurrence does reveal a situation as to records and acts done in the court presided over and conducted by the respondent which is contrary to a proper functioning of the same. One can scarcely understand how anything like that can happen in a court of record. And the major responsibility is always on the one who holds the highest office, in this case, the respondent judge.

(b) The complainant alleges that the respondent showed manifest incompetence when, in designating the Jury Commissioners for 1942–1943, he appointed one of them knowing that he had already acted as a commissioner during the previous year.

This charge was supported by documentary evidence. From the latter it appears that on April 1 last, the respondent judge designated as Jury Commissioner for the town of Añasco, Leovaldo E. Pijuán, who had served as such for the previous year, a fact which incapacitated him from acting during the present year. At this stage, on the first of the same month of April, respondent made an order setting forth that fact as an involuntary error and replacing Pijuán with José Francisco Rodríguez.

The respondent in his answer admitted the occurrence but denied that he had appointed Pijuán with knowledge that the latter had served during the previous year. At the hearing he testified, explaining the occurrence.

The charge does not reveal unfamiliarity with the statute, the pertinent part of which was read aloud by the judge himself in the proceedings had in open court; but it does show carelessness in its application in practice.

3. By the third charge the complainant maintains that the respondent judge was guilty of inexcusable negligence in failing to render judgment within the statutory period of twenty-four hours in the criminal cases Nos. 10800 and 10801, for carrying weapons and for failure to register firearms, instituted against Luis Peláez, and which were tried from the 21st to the 23d of January, 1941, upon the same evidence introduced in case No. 10799, a prosecution for murder against the same defendant; that in the same matter the respondent was guilty of immoral conduct and of behavior unworthy of a magistrate in drawing a minute on March 15, 1941, setting forth false facts as having occurred on January 24, 1941, which action also constitutes intermeddling on his part with the functions of the clerk of the court and shows incompetence.

The complainant introduced in evidence the original records of the prosecutions for murder (10799), carrying weapons (10800), and failure to register firearms (10801); those

of the certiorari (1262) and mandamus (365) proceedings, instituted in this court; the stenographic transcripts of the night session of January 23, 1941, in the murder case, and of the trials in the prosecutions for carrying weapons and for failure to register firearms; and a minute book. He also called M. A. García Méndez and V. Palés Matos to testify.

The following are indisputable and indisputed facts: the existence of the three prosecutions against Peláez to which we have already referred; the fact that those for carrying weapons and for failure to register firearms were submitted to the court presided over by the respondent judge upon the evidence to be introduced, as it was in fact introduced from the 21st to the 23d of January, 1941, in the prosecution for murder; that there was no verdict in the murder case; and that no judgment was rendered in the prosecutions for carrying weapons and for failure to register firearms within a period of twenty-four hours after the close of the evidence; and that about two months afterward, on March 15, 1941, the respondent judge made the following minute which the clerk of the court entered on pages 47 and 48 of minute-book No. 152:

"Regarding criminal case No. 10,800 for the offense of carrying weapons, and 10,801, for a violation of section 7 of Act No. 14 of July 8, 1936, as amended, it is declared that these cases were to await the trial and evidence in the felony case No. 10,799 against the same defendant for the crime of murder.

"The trial for murder was held on January 23, 1941, with the appearance of the parties, represented by their respective attorneys, and The People of Puerto Rico, by its Prosecuting Attorney at Large, and after the jury had retired to deliberate, at about one o'clock in the morning of January 24, 1941, the jury returned to the courtroom and stated that even if they continued to deliberate for a period of 15 days they would be unable to reach a verdict, for which reason the court discharged the jury.

"As none of the attorneys for the defendant was present in the courtroom, the court refrained from pronouncing sentence on the defendant in the cases for carrying weapons and registration of

firearms, and on the following morning, it advised V. Palés Matos and Carlos García Méndez, attorneys for said defendant, that if they desired to have the misdemeanor cases remain subject to the condition that they should be decided jointly with the felony case when a verdict should be rendered, they should present a motion in each one of the misdemeanor cases to which the within minute refers, accepting the condition that the misdemeanors should remain subject to be decided upon the determination of the felony case prosecuted against the defendant; and they promised to file said motion without the same having been filed by them up to the present in the records of the cases for carrying weapons and registration of firearms.

"In virtue thereof, and the court having accepted the condition that these two misdemeanors should be decided upon the determination of the felony case, the former shall remain pending until after in a new setting such determination is made against the defendant Luis Peláez."

The complainant asserts that it is not true that no judgment was rendered in the misdemeanor cases on the night of January 23, 1941, because of the absence from the courtroom of the attorneys for the defendant, or that on the following morning Attorney C. García Méndez and V. Palés Matos consented to have said misdemeanor cases continued subject to be decided upon the determination of the felony case. The respondent maintained that the facts occurred as recited in the minute.

We have examined and weighed all of the evidence adduced, and we are convinced that it is not true that the failure to render judgment in the misdemeanor cases (carrying weapons and nonregistration of firearms) was due to the absence from the courtroom of the attorneys for the defendant, and that it is not true either, that on the following day the attorneys for the defendant accepted the condition that the misdemeanor cases should continue subject to be decided upon the determination of the felony (murder) case against the defendant, as set forth by the judge in the minute of March 15, 1941.

From the stenographic record of the proceedings had in the night-session of January 23, 1941, when the jury which had acted in the felony case was dissolved, it appears that "Attorney Américo Seda" intervened and said: "Your Honor, I would request that by giving a reasonable time to the gentlemen of the jury, it seems to me, that they could, by considering the evidence and analyzing it anew, reach an agreement upon their verdict"; and notwithstanding the fact that the respondent judge has stated in his answer that Seda "was not a member of the staff of counsel for Peláez," a fact which "was personally known to the respondent judge," he freely allowed his intervention in the case in the manner indicated.

But even conceding that Seda was not one of the attorneys of record, it so clearly appears from the rest of the evidence that it was not due to the absence of counsel that no judgment was rendered, that we would always reach the same conclusion.

It seems advisable to refer to the testimony given before this court by M. A. García Méndez and V. Palés Matos, attorneys of record in the Peláez case.

Mr. García Méndez, after a series of evasive answers, testified as follows:

"Q. Can you not answer whether what is stated in that minute is true? You have answered that you do not know whether they are true.

"A. I have had no direct participation in what is stated here; it was related to me afterwards and then I refused to accept that as leading counsel in the case.

"Q. Did you refuse to accept it because it was not true?

"A. Not because it was not true; but because when Attorney Palés Matos told me that the judge had called by telephone on the following day in order to have a motion filed and he stated that there was no objection. When I returned from the United States and Attorney Palés Matos talked to me about the matter, I told him: 'By no means, if the case of People v. Acosta was decided in the sense that the case must be dismissed.' Then he called me and

told me that there was no objection on his part. I also called his attention to the fact that a dismissal must be entered in accordance with the case of People v. Corretjer; that it had been held that a dismissal must be entered. That is my position in the case. Whether it was because the attorney had answered that there was no objection on his part, a thing which I could not approve as leading counsel, because I could not waive a right of my client, or whether it was because even though he had agreed, taking into consideration the fact that I had a right to demand the dismissal on the authority of the holding in People v. Corretjer.

"Q. Mr. García Méndez, nowhere have you asserted or stated that none of the attorneys consented to a postponement of the rendition of the judgment in that case?

"A. What I have stated is that within the forty-eight hours immediately following the hearing of the murder case, neither this attorney nor any of the attorneys for the defense had appeared before that court, by which I meant to maintain that none of them had filed any motion waiving the defendant's right to demand a dismissal of the case. That the stipulation was the only thing that appeared in the record, that is, the original stipulation. I have not stated that what Palés told the judge or what the judge told Palés was not true. We did not appear within the forty-eight hours because that was the only legal question involved."

And Palés testified thus:

"A. . . . I wish to explain, because otherwise my answer would not give a clear view of the truth of the facts. With a mere yes or no nothing is answered. On the day following the trial in the felony cases, the district judge who had not rendered judgment, as was his duty and our opinion, in the misdemeanor cases, called me on the telephone at my office and told me that if we desired that the misdemeanor cases should continue to await the result of the felony case, we should make a motion to that effect. And he asked me to advise also attorney Carlos García Méndez and the other colleagues. 'Well,' I said to him, 'Judge, there is no objection on my part as to that being done. But that is something which must be agreed with the leading counsel, Attorney Miguel Angel García Méndez, and I must see him. The matter stood thus:

"Q. So that you did not agree to anything with him?

"A. No."

We are inclined to think that there was not even any conversation between the judge and Palés on January 24, 1941, but granting that there was one in the terms stated by Palés, what basis was there in it for the respondent judge to make the minute of March 17, 1941? None of a definite character, indeed.

The charge is a grave one. A judge may fail to discharge a duty by reason of an involuntary oversight, without a wrongful intention. All minds have a limit of endurance. After a trial for murder which has lasted for several days and which ends at night with the discharge of the jury which failed to reach a verdict, it is conceivable that a judge, who has not been advised by either the prosecution or the defense, should forget to comply with the duty of deciding by judgment two misdemeanor cases which were submitted to him upon the evidence introduced in the murder case; but what is incompatible with a serene and firm judicial conscience is to resort—if resort was actually had—to telephone conversations with counsel for the defendant, and attribute to them a scope which they did not have, or to imagine them completely or to fix them on a false date, in order to draw up, about two months afterwards, a minute which is ordered to be entered on the official books of the court so as to cure the mistake committed. A judge who thus acts, conducts himself in a manner contrary to law and to morals.

4. By the fourth charge the complainant maintains that the statements which he transcribes, made by the respondent judge in the criminal cases No. 12,114, People v. Dalmáu and others for rape, No. 10,799, People v. Peláez, for murder, and No. 11,898, People v. Toro Ortiz, for murder, constitute immoral conduct unworthy of a magistrate, and that his ruling refusing to excuse the juror Ruperto Santos also constitutes immoral conduct unworthy of a magistrate which endangers a good and sane administration of justice and invites the jury to enter into disputes with the district attorney by attempting to create prejudice against the latter.

The respondent in his answer maintains that he acted properly in those cases. He says that his statements were not fully transcribed in the complaint. He alleges that the unexcused juror had served on three cases in which District Attorney Suárez Garriga had acted and verdicts of guilty were returned, and that the district attorney had not challenged him either for cause or peremptorily; and he states that District Attorney Fornaris, when making the statements which gave rise to respondent's remarks, was completely intoxicated.

The evidence for the complainant in regard to this charge was documentary and consisted of the records of the above-mentioned criminal cases; that for the respondent was oral. In rebuttal, District Attorney Fornaris and other witnesses testified for the complainant.

Whatever may have been the condition of District Attorney Fornaris when he manifested his disagreement with the verdict of not guilty rendered by the jury in the murder case involved, and however harsh his comments might be, the fact is that upon examining independently the remarks made by the respondent judge, some statements are found which reveal, not the firm and sure guide who points out the only path to be followed—that of the discharge of duty—but one who, being unable to conceive the greatness of his mission, or if able to conceive it, has not within himself sufficient moral strength to rise to its level, reconciles himself to any situation, accepts and explains the same and even resorts to flattery when censure is the proper course.

It is true that an injustice might be committed by taking an isolated paragraph from a series of statements, which constitute a whole, and placing upon it all the emphasis, without taking into account the other paragraphs; but when after considering the whole of certain statements, it is concluded that their substance is found in one of the paragraphs, or when it is somehow observed that the mind of their au-

thor is reflected, whether willingly or not, in a portion of them, such paragraph or portion may be invoked in a case like the present in order to judge the personality of the author.

And, certainly, the personality of a judge is not in harmony with the mission entrusted to him when, as in the case of the respondent herein, in addressing certain jurors who had been criticised by a district attorney—the judge himself acknowledging that the verdict which they rendered and which gave rise to such criticism was not the proper one in accordance with the evidence—as happened in this case, and after some exaggerated praise, seeking, in his opinion, to lessen the bad impression caused by the attitude of the district attorney in order to conciliate matters, he says to them:

"So that this court respects the verdicts of the jury. They are absolute and we can not interfere with the power which the jury has to convict or acquit an accused. This is proved by the fact that a verdict may be returned at any hour, no matter what grounds the jury may have had, and if that verdict is one of acquittal, from that moment the accused is free."

The estimate thus made is strengthened by the fact that the same judge, in discharging a jury which had reported to him that it was unable to reach an agreement, in another murder case, unnecessarily said:

"Gentlemen, the jury are triers of fact, the final authority in the weighing of the evidence, and your decision will be upheld by this court as long as I am its judge; and I am fully confident that you, when appearing in court, will state it, not only through the foreman but also by any individual member. The court is pleased that these members of the jury should be resolute, should be honest, as gentlemen and honest men of this district; he who wished to acquit has expressed his frank and sincere opinion that he ought to acquit the defendant, and he who believed that he ought to convict him has also expressed his courageous opinion that he could not acquit him, and this does honor to the one as well as to the other, and the court takes pleasure at this time in extending its congratulations to the jury. The court discharges the jury and sets the

case for trial in the next criminal term to be tried and judged by a jury. I thank you for the services which you have rendered to justice in the District Court of Mayagüez.''

As to the failure to excuse a juror, we have examined the evidence and weighed the attendant circumstances and we fail to find that the conduct of the judge was illegal or improper.

5. There only remains to be considered the fifth charge which is of a different character from those which we have already stated and passed upon. By its terms the judge is represented as being outside the court in ''La Greca'' Restaurant, in the city of Mayagüez, and performing acts which, as alleged by the complainant, show immoral conduct unbecoming a judge.

The evidence introduced by the complainant to establish the charge was wholly oral; that adduced by the respondent was both documentary which consisted of a copy of a confidential police report forwarded by the Attorney General to the District Attorney of Mayagüez, and oral. There is no controversy as to there having been announced for the night of December 10, 1941, in Mayagüez, by the authorities with power to do so, in view of the present war situation, a blackout practice; nor as to the respondent judge having entered, together with Ignacio Saavedra, ''La Greca'' Restaurant shortly before the blackout; nor as to a dispute having arisen because of the fact that a light that stood on the table occupied by the judge had not been extinguished. It is as to the details of the conduct of the judge that the conflict exists.

We heard the witnesses testify and we have again examined their testimony, and our consciences lead us to resolve the conflict against the respondent. We think that the witnesses Luis A. Rosado, M. A. Díaz, A. Vilanova, and Iris Agostini substantially told the truth.

Luis A. Rosado, an insular policeman, assigned for duty on the night of December 10, on the corner of Muñoz Rivera

and Peral streets, in Mayagüez, where "La Greca" Restaurant, belonging to M. A. Díaz, is located, testified that he had to take steps in connection with the respondent judge by reason of the blackout. Before the blackout began, Díaz went out of the restaurant and announced to him that the siren was about to be sounded. He suggested to the corporal of the Home Guard that he go into the establishment. He remained outside.

"When the siren was sounded, all the lights in the city of Mayagüez were put out, and in 'La Greca' Restaurant there remained an unextinguished light which radiated into the street. People protested, they threw stones, they struck on the doors with sticks; a large crowd gathered and I, as an insular policeman, had to make the crowd disband; as I did not succeed, I told the corporal of the Home Guard who was with me: 'Go inside and tell them to put out the light.' Seeing that the corporal of the Home Guard could not put out the light, I left the crowd and went to see Mr. Francisco Navarro Ortiz, and told him: 'Counselor, the alarm was sounded more than fifteen minutes ago; the people are protesting and they are accusing me of being negligent and I do not want to be so accused. With all the respect due to you from me, I want you to accede to my request.' To which he replied that that light could not be seen even at a distance of twenty feet. Then the corporal of the Home Guard was with me, as I had entered to give him aid, and Mr. Saavedra, who was already irritated by reason of the presence of the corporal of the Home Guard, told him that they were obeying orders which were too severe and that that was a ground on which he could not go, that if he thought that he had any authority he should go ahead and arrest them. The corporal told me: 'Arrest this man for me,' and I told him: 'Let us be calm, I am going to deal with this in a manner that will not create a more serious situation.' Then we insisted that those people should go out and that the light be extinguished. Then I took these gentlemen out of the establishment . . . Mr. Francisco Navarro Ortiz and Mr. Saavedra; . . ."

The policeman also stated that when he went into the restaurant the judge and Saavedra were drinking. One of the attorneys for the respondent exhibited to him the copy of

the police report which was subsequently introduced in evidence, and the witness said: "I do not recognize that as the report which I made." In the one so made "I recited the facts."

M. A. Díaz testified that the judge and Saavedra arrived at his establishment at about eight o'clock in the night of December 10, 1941, and stated that they were going to dine. They ordered three "highballs" which he served to them. He talked to the policeman Rosado and told him "that at any time he wanted he could come into the establishment so that in one way or another he should state how we were going to put out the light."

He stated that after the siren announcing the blackout had been sounded, he left "a small piece of candle lighted in order that Mr. Navarro and Mr. Saavedra could finish their dinner," and then a protest arose from the people, who shouted loudly and pounded on the doors. The light may have been burning for five or ten minutes. He called the police and Mr. Navarro and Mr. Saavedra went out "after a policeman and a local guard had come in and told them of the protest of the people."

A. Vilanova, corporal of the Home Guard, charged with patrolling with five men the section of the city where "La Greca" was, stated:

" . . . Díaz joined us and asked 'who is the corporal?' and I told him 'I', and he said to me 'will you accompany me to the establishment; I have some gentlemen at a table and I shall not be able to put out the light, that is, the electric bulbs.' Then I went with him into the establishment and when I arrived there, I found three individuals, three gentlemen, one Mr. Navarro Ortiz, another named Saavedra, whom I do not know, and another who was an officer of the firemen brigade of Mayagüez, and whose full name I do not remember, but he is Torres Córdova. The latter, when I reached the table told me, as if trying to joke with me: 'You know these gentlemen?' as if threatening me, 'Yes, sir, the Judge of the District Court and this other one I have not the honor of knowing'; and then Mr. Saavedra told me: 'Gosh, I never thought that in

Mayagüez they would have a company so well trained as this one; you have your own officers and what are their names?' I answered 'Luis Muñiz and Jaime Alcover Arrillaga.' Releasing Mr. Saavedra, Mr. Navarro Ortiz said to me: 'Tell me, don't you know that martial law has not yet been declared in Puerto Rico?' and I told him: 'Yes, sir, you are right, but that is in the hands of the Governor, and he may declare it at any time that he may think it necessary.' 'We have an order from the War Department and it must be enforced; therefore, I ask you to put out the light as soon as the siren is sounded.'

"Q. Did you have to take some steps in connection with them on that same night?

"A. About 20 minutes later, I had four men under my command and I went patrolling up a certain part of the city which was in my charge, and on arriving at the 'La Greca' establishment, I found that there was an uproar, and immediately Mr. Tuto Díaz returned and suggested that I should go, and I went and found that there was a dispute; I told him: 'Call the police for that, I can do nothing, the lights are out', and he said to me: 'But that can not go on that way,' and when I entered the second time, Mr. Saavedra, in a condition somewhat enraged lifted a chair this way and then I did like this, as I thought that he was going to hit me. He told the policeman: 'Arrest this man who is acting in a field which does not concern him.' Naturally, the policeman did not do it, but told me: 'You are discharging your duty and I have the right to protect you; we have to be on your side in order to protect you at any time.' Then Mr. Navarro Ortiz said: 'Gentlemen, this light can not be seen even 20 feet outside this establishment. As you have already dined, you care little if we have not done it.' Then I answered: 'I am very sorry you should not have done it when the whole Island of Puerto Rico knows that tonight there would be a blackout in the Island.' . . ."

Lastly, Iris Agostini testified that she had gone into "La Greca" on the night of the occurrence at about 8:20 o'clock in order to buy some *pasteles* (a native dish), and saw there "Counselor Francisco Navarro Ortiz; he was at a table with two other gentlemen, in a corner, they were eating and drinking. Counselor Navarro Ortiz spoke to me: 'Hey, good-looking, come and dine with us,'" and "he tried to stand

up, he tried, but he did not stand up, . . . well, because of his intoxicated condition.''

Allowing those statements to speak for themselves, without the addition of any comments, the unavoidable conclusion is reached that a man who conducts himself as the respondent did in ''La Greca'' Restaurant, on the night of December 10, 1941, is not qualified to discharge the office of judge in the community.

6. The introduction of evidence regarding the sixth charge, which relates to the incompetence that, according to the complainant, is shown by the high percentage of decisions rendered by the respondent judge which this Supreme Court has reversed on appeal, was postponed by order of the court. It will not be necessary to reopen the investigation. As we have just seen, the evidence in regard to the other charges is sufficient.

The lawmaker has ordained in the first paragraph of §3 of Act No. 58 of 1930, already cited, that any district judge of the Island who may be accused of ''having committed prevarication or bribery, or of having observed immoral conduct, . . . inexcusable negligence, or manifest incompetence to perform his duties, shall be removed by the Governor of Puerto Rico upon recommendation of the Supreme Court,'' after proceedings which the same statute prescribes.

Here the respondent judge was charged with immoral conduct, inexcusable negligence, and manifest incompetence; the lawful procedure was followed; and evidence was introduced with the result which we have already stated.

Six charges were preferred against the respondent by the Attorney General. The latter subsequently added four to the first and two to the second. Five of the charges with their additions were proved before this court. Some of the additions alone would not constitute a sufficient ground for removal. All of them, however, unite with each other and militate with more or less force against the respondent.

Among the five charges, the second, the third, and the fifth· are of such gravity that they demand, as an unavoidable consequence, the removal. The fourth and first charges are also serious by reason of their implications.

The work of competent, diligent, and moral judges is absolutely necessary in the district courts in order that the judiciary may retain its prestige, inspire confidence, and fulfill its mission, so that it will administer justice to all equally, speedily, and fittingly. The respondent judge, by his actions, has placed himself outside that sphere of effort.

The evidence shows beyond a reasonable doubt that said respondent judge, Francisco Navarro Ortiz, Judge of the District Court of Mayagüez, is guilty of the immoral conduct and of the inexcusable negligence in the discharge of his office with which he was charged, and therefore, in accordance with the law, his removal must be recommended to the Governor of Puerto Rico.